Filed 2/24/24  P. v. Torres CA2/8

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br> ISAAC TORRES,<br><br>    Defendant and Appellant. | B319299<br><br>(Los Angeles County<br>Super. Ct. No. BA491138)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the opinion filed herein on January 16, 2024, be modified as follows:

On page 34 of the opinion, the Disposition paragraph is deleted entirely and replaced with the following paragraph:

> We strike the eight-year determinate terms for counts 2, 3, and 4.  We reverse the count 1 conviction for domestic violence in violation of section 273.5, and remand to permit the People to retry appellant on this count if they choose.  Once this charge is resolved, the court should hold a full resentencing hearing.  We affirm the judgment in all other respects.

There is no change in the judgment.

The petition for rehearing is denied.

_____
STRATTON, P. J.　　　GRIMES, J.　　　WILEY, J.

Filed 1/16/24  P. v. Torres CA2/8 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B319299 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA491138) |
| v. | |
| ISAAC TORRES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert C. Vanderet, Judge.  Affirmed in part, reversed in part and remanded with directions.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Isaac Torres appeals his convictions, following a jury trial, of domestic battery (Pen. Code,[1] § 273.5, subd. (a)), forcible rape (§ 261, subd. (a)(2)), forcible oral copulation (§ 287, subd. (c)(2)(A)), forcible sexual penetration (§ 289, subd. (a)(1)(A)), and threatening a witness (§ 140, subd. (a)). The jury found true the allegations that appellant had a prior conviction for domestic violence (§ 273.5, subd. (f)(1)) and had kidnapped the victim for the three sexual offenses (§ 667.61, subd. (d)(2)). The trial court sentenced appellant to five years for the domestic battery conviction, eight years plus 25 years to life for each of the three sexual offenses and one year for threatening a witness, all imposed consecutively for a total of 30 years plus 75 years to life.

Appellant appeals from the judgment of conviction, contending the trial court erred prejudicially in admitting evidence of uncharged acts of domestic violence pursuant to Evidence Code section 1109 and in admitting his statement indicating an affiliation with a Mexican drug cartel. Appellant further contends the court erred prejudicially in failing to instruct the jury sua sponte on assault and battery as a lesser included offense of domestic battery. He contends these three errors were cumulatively prejudicial.

Appellant also contends the trial court erred in sentencing him consecutively on the three sexual offenses because there is insufficient evidence to support the court's finding that the offenses were committed on separate occasions, and in failing to submit the separate occasions to the jury for fact finding.

We agree the trial court erred in failing to instruct on the lesser included offenses of domestic battery. We cannot find the

---

[1]     Undesignated statutory references are to the Penal Code.

2

error harmless, and so we reverse the conviction on count 1 and remand to permit the People to retry appellant on this charge or to accept a reduction to the lesser included offense of simple assault or battery, whichever offense has the longer term under the circumstances of this case. Appellant and the People agree that the eight-year determinate terms for the sexual offenses are unauthorized and must be stricken. We agree as well and order them stricken. We affirm the judgment of conviction in all other respects.

## BACKGROUND

Kenia, the victim in this case, met appellant at her aunt's birthday party. Kenia was using drugs at the time. Appellant gave her cocaine. The two exchanged telephone numbers. Thereafter, they texted each other and spent time together. As set forth in more detail in section C of the Discussion below, Kenia gave somewhat inconsistent accounts of the relationship. She told police she was dating appellant, but at trial she testified that their relationship was a transactional one, in which she had sex with appellant in exchange for drugs or money.

The last time Kenia had consensual sex with appellant was in May 2019. Kenia contacted appellant twice after that, once in July to ask for cocaine for her godmother and once in September to ask for help with her boyfriend. Appellant did not respond to either message.

On the morning of October 12, 2019, appellant called Kenia repeatedly from a blocked number. Cell phone records showed that appellant called Kenia 53 times that day, starting at 8:37 a.m., mostly using a blocked number. Kenia did not answer most of the calls. When she finally answered, she told appellant to stop calling and to leave her alone. Appellant said he was "too

3

fucked up to drive." He offered to let Kenia use his car if she agreed to help him by driving him to another car. She agreed to help him, but said it would be the last time. Appellant said he was waiting outside her house.

Kenia went outside and saw that appellant was in a gray car which she had not seen before. Kenia got into the driver's seat. Appellant was drinking and had possibly used drugs.[2]

Kenia drove, following appellant's directions, and told him she did not want to see him anymore. Appellant eventually told her to pull over and step on the brake. When she did so, appellant started punching her in the face. He said, "I can make you do things you don't want to do." Kenia tried to call 911, but appellant took away her phone. Appellant grabbed her around the neck and forced her toward the back of the car, into the floor area behind the driver's seat. Appellant applied pressure to her neck, strangling her. According to Kenia, appellant had never before been violent toward her.

Appellant eventually stopped strangling Kenia, got into the driver's seat and drove to a parking lot. There, he took cocaine and began stroking her knee. Kenia asked him to take her home. Appellant began driving again. He drove to the bottom level of an underground parking garage of a building where he used to work. It was empty at that level. There, as set forth in more detail in section D of the Discussion below, he forcibly orally copulated her, forced her to insert a foreign object into her vagina and forcibly raped her.

---

[2] Kenia initially asked her sister to come with her, but appellant objected when Kenia's sister got into the back seat of the car, and so she left.

After appellant completed the sexual offenses, he seemed calmer.  He told Kenia he would return her phone to her and take her home.  Appellant was unable to find the phone in the car.  He retraced the route they had taken and found the phone in the street in front of the restaurant where Kenia worked.

Kenia ran into the restaurant and called her mother and told her what had happened.  Her mother called an Uber for her.  Kenia also called her aunt, who was a friend of appellant, and told her what had happened.  Her aunt told her to go to the police.

Kenia went home in the Uber, then to the police station with her cousin.  At the police station, she made a report.

Los Angeles Police Department (LAPD) Officers Daniel Battles and William Thomas noticed that Kenia's nose was swollen and she had a bruise on her neck.  She looked like she had been crying.  After interviewing Kenia for about an hour, the officers took her to the Santa Monica Hospital Rape Treatment Center.

The Sexual Assault Response Team (SART) nurses examined Kenia and took photographs.  Their report showed a bruise on Kenia's leg, bruising to her eyes, and an abrasion on her neck.  The latter two injuries were consistent with strangulation.  The eye bruising was also consistent with being punched in the nose.  Kenia told the nurses the last time she had consensual sex was with her boyfriend three days earlier.

Samples taken during the SART exam were analyzed.  Appellant contributed all of the male DNA on Kenia's cervical swab, external genital swab, mons pubis swab, and perianal swab, and 98 percent of the male DNA on her vaginal swab.  DNA was also found on a swab from Kenia's neck; appellant

5

contributed 11 percent of that DNA, while Kenia contributed 86 percent.

Appellant's former girlfriend, Carissa Hayden, testified that on October 12, 2019 (the same day as the assault on Kenia), she and appellant drove her mother's car, a gray Honda, to visit some of Carissa's family members in Mentone in San Bernardino County, arriving at 9:00 or 10:00 a.m. Appellant then left, saying he was going to pick up some money and meet someone to buy cocaine. Cell phone records show appellant's phone was moving from San Bernardino toward Los Angeles at 9:11 a.m. According to Carissa, appellant was gone a long time, at least four to five hours.[3] Carissa became angry and called and texted him numerous times. Cell phone records show she called him 146 times; most calls went unanswered. When appellant returned, Carissa discovered the gas tank, which previously had enough gas to get them home, was now empty. Appellant did not have the drugs he said he was going to pick up.

Location data showed appellant's phone at Kenia's house the morning of October 12, 2019 and at each of the three locations she described driving to that morning. Kenia's phone was in the same place as appellant's phone, with the exception of the underground garage, until 11:15 a.m. The phones diverged at that point. Appellant's phone moved toward San Bernardino. Kenia's phone went to her home and the police station.

---

[3]    At the preliminary hearing, Carissa had testified appellant was with her all day in Mentone. At trial, she explained she lied because she was afraid of appellant and the people he knew. Appellant told her people were going by her house and it would be in her best interest to say they were together. Appellant had once grabbed her arm and hurt her shoulder.

LAPD had difficulty locating appellant after his attack on Kenia. Detectives suggested she message appellant's cell phone. When appellant responded, he was angry that Kenia had sent police to his house. Appellant threatened Kenia, as detailed in section B of the Discussion below. One of the threats was a statement that he was going to talk to "Jay from Sinaloa."

The parties stipulated that appellant had suffered a prior misdemeanor conviction for domestic violence; the prosecutor offered the details of his attack on the victim pursuant to Evidence Code section 1109 to prove appellant's propensity for such violence. The victim, Jazmina Soto, testified she lived with appellant for about four years. Their relationship was a difficult one and he once choked her. In September 2014, she moved out while he was at work, and ended the relationship.

In October 2014, appellant showed up unannounced at Jazmina's new home, and knocked on her bedroom window. She told him to go away. He tried to enter the house through the window but was unsuccessful and appeared to leave. Jazmina went back to bed, but a few minutes later, she heard the kitchen window open. She looked out and saw appellant half way through the window. Jazmina ran out of the house, called her mother, then 911, as appellant chased her. Appellant caught her by the hair, threw her to the ground, kicked her in the ribs and said, "You fucking bitch. Nobody tells me no."

Jazmina's mother arrived at the scene. Appellant dragged Jazmina by her hair for a few feet. He then took her phone and left. Jazmina obtained a restraining order, which appellant repeatedly violated by coming to her home. Appellant was convicted in May 2016 of misdemeanor domestic battery.

Appellant testified on his own behalf at trial. He admitted that things sometimes became "physical" when he and Jazmina disagreed. He denied climbing through the window into her house, pulling her to the ground or kicking her. He pled no contest to the misdemeanor because he did not want to miss work.

Appellant denied ever selling drugs and claimed he had only used cocaine once. He made money by gambling. He did not own a gun.

Appellant and Kenia's aunt were friends; he met Kenia at her aunt's birthday party. He was 34 years old and Kenia was about 18 years old. She asked him for a ride and he gave her one. She asked him for his phone number, hoping he could help her with her brother, who was "following bad footsteps." Kenia texted him a few days later and they met up. She often asked him for rides and money, which he gave her. He helped her get marijuana.

They began having sex a few months later, in a park, at Kenia's instigation. Thereafter, Kenia contacted him when she needed something. They would sometimes have sex.

Appellant testified he saw Kenia three times in the week before October 12, 2019. On October 7, Kenia asked him to drive her and her aunt to a cleaning job in West Los Angeles, and he did so.[4] On October 9, Kenia asked appellant to pick her up from school because her boyfriend had hit her. Appellant picked her

---

[4] Data from appellant's cell phone showed calls between Kenia and appellant and movement of their phones together to West Los Angeles, but on October 9, not October 7.

up and they went to a motel and had sex. Kenia's neck was red from being hit by her boyfriend.

On October 11, 2019, appellant picked Kenia up and they had sex in the back of his car. He did not wear a condom. When appellant took Kenia to her home, her boyfriend was there, and he and appellant got into a physical fight. Kenia tried to intervene and her nose was broken.

That night, appellant went out and left his phone in a friend's car. The next morning, on October 12, 2019, appellant went with Carissa to Mentone. They went to a bar and then to her father's house. Appellant used Carissa's phone to call his phone many times, hoping that someone would answer it. Around 3 p.m., appellant drove to Covina to get money and then returned to Mentone. He did not see Kenia that day. Appellant gave conflicting testimony about whether he spoke to Kenia on the telephone.

In rebuttal, the prosecution offered the expert testimony of LAPD Detective Lyman Doster that several text messages on appellant's phone were indicative of drug sales. Two of the messages referred to Sinaloa: "Cartelly. My family is Sinaloa" and "I have my regular Sinaloa shit." Detective Doster testified there is a drug cartel in Sinaloa.

## DISCUSSION

A. *The Trial Court Properly Admitted Evidence of Appellant's Prior Incident of Domestic Violence.*

Appellant was charged with one count of domestic battery violence for his attack on Kenia near the beginning of the drive. He contends the trial court abused its discretion in admitting evidence of a past act of domestic violence against a former

9

girlfriend, Jazmina, which resulted in a misdemeanor conviction. Appellant acknowledges that Evidence Code section 1109 permits the admission of past acts of domestic violence. He contends the evidence was nevertheless inadmissible under Evidence Code section 352, because the evidence had a "severe" risk of causing undue prejudice and confusion, which substantially outweighed the minimal probative value of the cumulative evidence. He contends the erroneous admission of the evidence violated his state and federal right to due process.

In a criminal action "in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] [s]ection 1101 if the evidence is not inadmissible pursuant to [Evidence Code] section 352." (§ 1109, subd. (a)(1).) Thus, other acts of domestic evidence are admitted to show the defendant's propensity to commit such crimes. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232–1233.)

Evidence Code section 352 requires the court to determine whether the probative value of the evidence is "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We review a trial court's ruling under [Evidence Code] section 352 for an abuse of discretion. (*People v. Mani* (2022) 74 Cal.App.5th 343, 358.)

Appellant complains of the brevity of the trial court's ruling on the evidence, specifically the court's failure to expressly address the relevant Evidence Code section 352 factors. It is well settled that the trial court " 'need not expressly weigh prejudice

10

against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 344.)

The record shows such awareness by the trial court. The prosecutor filed two briefs on the admissibility of the evidence. These briefs discussed both Evidence Code sections 1109 and 352, and specifically applied the Evidence Code section 352 factors to the facts of this case. Both appellant and his attorney were able to raise objections to the admission of the evidence at three different hearings. Appellant, when in pro per, objected that the evidence was not relevant. Later, his counsel objected that the prejudicial impact of the evidence significantly outweighed its probative value and would require a mini-trial and undue consumption of time. Subsequently, counsel also argued that the prior incidents were nothing like the incident in this case, due to the sexual assaults.

Substantively, appellant contends the Jazmina incident had minimal probative value because it was not similar to the charged incident. Specifically, appellant claims the Jazmina incident did not involve allegations of sexual offenses as did the charged incident. The Jazmina incident also included a claim that appellant violated a restraining order and broke into Jazmina's home but the charged incident did not.

Although appellant's entire course of conduct included sexual assaults on Kenia, the battery which was the basis of the domestic violence charge occurred first and in a separate location from the sexual offenses and was charged separately. The jury was instructed that the domestic violence against Jazmina could only be considered in deciding the domestic violence charge.

11

We reject appellant's argument that Evidence Code section 1109 evidence can only be introduced where only domestic violence is at issue and there are no other charges alleging sexual criminal conduct. There is no such restriction in that section.

Because use of the prior incident was limited to the domestic violence offense, the appropriate comparison to determine probative value is between appellant's initial conduct in this case and his prior act of domestic violence against Jazmina. Appellant is correct that even with this narrower view, the two incidents are not identical. But, as the People point out, there are significant similarities. In both cases, the victim was an ex-girlfriend, and appellant showed up at the victim's house unannounced. In both cases, when the victim told appellant that she wanted him to leave her alone, appellant physically assaulted her. He told both victims, in essence, that he would not take no for an answer. More specifically, when Jazmina told appellant to go away, he broke into her house. When she fled, he caught her, kicked her and dragged her along the ground. He said, "Nobody tells me no." When Kenia told appellant that she did not want to see him anymore and wanted him to leave her alone, he told her to pull over and then started punching her. He told her, "I can make you do things you don't want to do." Then he started choking her. Given these similarities, we find the probative value of the prior incident to be strong.

Turning to the factors which weigh against the admissibility of probative evidence, appellant contends Jazmina's testimony was completely unnecessary to the prosecution's case, which depended on whether the jury believed Kenia's testimony or not. We fail to see the logic of this argument.

As the jury was correctly instructed in this case, in evaluating the credibility of a witness, the jury could consider anything that reasonably tends to prove or disprove the truth of the witness's testimony, including how reasonable that testimony is "when you consider all the other evidence in the case" and whether "other evidence [in the case] prove[d] or disprove[d] any fact about which the witness testified." Jazmina's testimony that appellant committed a prior act of domestic violence could show that he was disposed to commit domestic violence and likely to commit the charged act of domestic violence. This would certainly support Kenia's testimony.[5]

Appellant also contends Jazmina's testimony was cumulative because the prosecutor could simply have introduced appellant's record of conviction to prove the prior conviction allegation attached to the current domestic battery charge. That argument might have some force if the only reason to introduce Jazmina's testimony was for this purpose, but it was not.

Appellant next contends Jazmina's testimony had a severe risk of undue prejudice. Because the prior incident was more inflammatory than the current conduct, the jury might seek to

---

[5] To the extent appellant contends that Jazmina's testimony was cumulative on the issue of Kenia's credibility, appellant has failed to provide factual argument or record cites to support such an argument. In appellant's cited case of *People v. Mincey* (1992) 2 Cal.4th 408, the Court found the challenged evidence about the defendant's girlfriend's behavior, proffered as third-party culpability evidence, to be cumulative because four other separate pieces of evidence directly supported that challenged behavior. (*Id*. at pp. 439–440.) Appellant has not cited any such additional evidence concerning Kenia's testimony about the domestic violence.

punish him for his prior conduct, and the evidence of the prior conduct was stronger and bolstered the comparatively weaker current case.

Evidence is unduly prejudicial " ' "when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." ' " (*People v. Megown* (2018) 28 Cal.App.5th 157, 164.)

Appellant contends Jazmina's testimony was more inflammatory than the charged act because it involved claims that appellant broke into Jazmina's house and violated a restraining order.  We cannot agree.

Appellant's attack on Jazmina was short and so involved less physical violence.  Once Jazmina's mother arrived, appellant left.  His attack on Kenia lasted longer and resulted in more severe injuries.  When appellant stopped choking Kenia, she remained imprisoned in his car and at his mercy.  Further, in terms of undue prejudice, we do compare the totality of appellant's behavior with Jazmina to the totality of his attacks on Kenia, and his attacks on Kenia involved sexual assaults as well as the initial physical assault.  In this context, his prior conduct with Jazmina is significantly less inflammatory than the charged offenses.

Appellant also contends that because his attack on Jazmina was punished as a misdemeanor, the jury might be tempted to convict him of the charged offense as a way of punishing him for his uncharged acts of breaking into Jazmina's house and

14

violating a restraining order.  Appellant is simply speculating that a jury would believe a misdemeanor conviction was not punishment enough.  Generally, a conviction for the prior conduct reduces the prejudicial potential of the conduct underlying the conviction.  (*People v. Jones* (2011) 51 Cal.4th 346, 371–372.) Appellant's argument that this case is an exception to the general rule is based in large part on his claim that the prior conduct was more inflammatory than the conduct in this case.  We have rejected that argument and so necessarily reject the conclusion based on it as well.

Appellant contends evidence of the prior incident was stronger because appellant pled no contest to it, and so it was deemed conclusively proven, while in this case appellant denied the charged conduct, making the present case relatively weaker. (See *People v. Jandres* (2014) 226 Cal.App.4th 340, 356.) Appellant denied kicking or pulling Jazmina to the ground, as well.[6]  Further, appellant's testimony concerning the events of October 12, 2019 was contradicted by Carissa, and his claim that his cell phone was in a friend's car (and just happened to be in the places described by Kenia) was not particularly credible. Thus, we do not view the evidence of the prior incident with Jazmina stronger than the evidence in this case.

Appellant next contends Jazmina's testimony was likely to confuse the jury because he disputed the specifics of what happened during his battery of Jazmina, and a mini-trial on this collateral topic was required.  He again contends the jury's main

---

[6]    Appellant testified that he pled no contest to a misdemeanor arising from the October 19, 2014 incident because he had a good job that he did not want to lose by going to court a lot.

15

inquiry was Kenia's credibility.  This is simply a rehash of prior arguments.

The prior incident did have a bearing on Kenia's credibility, as we have just discussed.  Similarities between the prior incident and the charged incident increase the probative value of the prior incident, as appellant has acknowledged, and so the details of the prior incident were relevant to the prior incident's admission under Evidence Code section 1109.

Appellant also contends the lower standard of proof for the prior incident created a risk of confusion, as did the limitation of using the prior incident only for the domestic violence charge and not the sexual offense charges.  The jury learned of the different standards of proof via CALCRIM 852A.

In considering substantially similar language in an instruction explaining the admission of prior sexual offenses under Evidence Code section 1108, the California Supreme Court stated, "We do not find it reasonably likely a jury could interpret the instructions to authorize conviction of the charged offenses based on a lowered standard of proof." (*People v. Reliford* (2003) 29 Cal.4th 1007, 1016; *People v. Johnson* (2008) 164 Cal.App.4th 731, 738–739 [rejecting argument that Evidence Code section 1108 instruction confuses and misleads the jury about the burden of proof].)  Appellant provides no basis to distinguish the instruction in this case for Evidence Code section 1109 from the instruction for Evidence Code section 1108.

As for confusion about the use of the prior incident, the limiting language of the instruction is clear, and this limitation makes logical sense.  Having once engaged in a specific type of conduct, a person may be more likely to repeat that specific conduct again.  There is no logical reason to think such past

16

conduct makes it more likely that a person will engage in a new and different type of conduct.  In addition, as respondent points out, the placement of the limiting instruction reinforces the limited use of the prior incident.  The instruction on the current domestic violence charge was given first, then the prior conviction allegation for that count, then CALCRIM 852A on the prior incident.  Only after that were instructions on the other offenses given.

In sum, we find the evidence of the Jazmina incident to have strong probative value, with no potential for undue prejudice.  It was not likely to cause confusion and did not result in undue consumption of time.  Thus, there was no abuse of discretion in admitting the evidence.  Because we find no error in the admission of the evidence, there was no violation of appellant's due process rights.

B. *The Trial Court Properly Admitted Appellant's Statement Indicating Affiliation with a Drug Cartel and Related Explanatory Evidence.*

Appellant contends the trial court abused its discretion in admitting evidence that appellant was affiliated with a Mexican drug cartel because its probative value was minimal and was far outweighed by its severe risk of causing undue prejudice and confusion.  He further contends the erroneous admission of this evidence violated his federal constitutional due process rights.

The evidence of appellant's affiliation with a cartel was raised by appellant himself, in a statement threatening Kenia for contacting the police.  He initially told her he was going to speak with Jay from Sinaloa, and Jay was his "homie that [was] in charge."  As the result of this statement, appellant was charged with violating section 140, subdivision (a), which prohibits using

17

"force or threaten[ing] to use force or violence upon the person of a witness to, or a victim of, a crime or any other person, or to take, damage, or destroy any property of any witness, victim, or any other person, because the witness, victim, or other person has provided any assistance or information to a law enforcement officer, or to a public prosecutor in a criminal proceeding."  (§ 140, subd. (a).)

The statute penalizes "only 'those threatening statements that a reasonable listener would understand, in light of the context and surrounding circumstances, to constitute a true threat, namely, "a serious expression of an intent to commit an act of unlawful violence." ' "  (*People v. Pineda* (2022) 13 Cal.5th 186, 248.)

Even when a gang enhancement is not charged, gang evidence may be relevant to the charged offense, and admissible so long as it is not more prejudicial than probative and is not cumulative.  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223.)  Thus, evidence of gang membership can help prove the means of "applying force or fear."  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)  More specifically, a reference to knowing gang members can reasonably be understood as a threat of violence.  (See *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1341 [defendant told witness he was going to talk to his fellow gang members, and witness became fearful for her life because she knew they were capable of violence and would not hesitate to retaliate against her].)

Any reference to gang affiliation carries some potential for undue prejudice, but there was no information here which increased that potential.  There was, for example, no evidence of the activities of the drug cartel in Sinaloa, apart from drug sales.

18

There was ample other evidence from Kenia and Carissa that appellant himself sold drugs.

Appellant contends the Sinaloa evidence was cumulative because Kenia testified she was already afraid of appellant before receiving the Sinaloa message. Appellant has not cited any cases where the charged offense involves making threats, and the court held that one in the series of threats should be excluded because it was too prejudicial.

Here, appellant's threats built in intensity. He texted: "After I saw you, [Kenia], people were mad. If I get locked up, they gonna come for people." As appellant points out, Kenia did react to this threat. She testified she was scared because she understood that this meant that her brother would be shot. No such threat is obvious from appellant's actual statement. Kenia explained that her fear was based on a prior statement by appellant that he "knows people that can . . . take care of a job and . . . that [she] should be afraid of" those people. Without any indication of who these people were, the evidence is not overwhelming that this was a serious threat or that it was reasonable for the recipient to be afraid.

The next threat was "I wouldn't want anything to come down on you or your family." Kenia did not offer any testimony about this threat, which is a broad vague statement. Again, without more information, the evidence is not overwhelming that this was a serious threat or that it was reasonable for the recipient to be afraid.

Then came the third threat, in which appellant said he would talk to "Jay from Sinaloa." Kenia testified she became scared when she heard this, because Sinaloa is "cartel." On redirect, she testified appellant explained that Jay was "my

19

homie that is in charge." Kenia explained this was the first time appellant had ever mentioned the name of anyone he worked with, and she wondered why he was doing so now. She also explained, "I'm from Mexico, so I know how Sinaloa is and I know there's a bunch of cartel out there and [appellant] deals with cocaine, so I tried to add everything up."

Thus, the revelation that Sinaloa were the people appellant worked with made his previous vague threats much more serious and compelling, and made the implication of violence more believable. We do not view this evidence as cumulative, unnecessary, or only tangentially relevant.

We also do not view the Sinaloa reference as cumulative or unnecessary because Kenia was already afraid of appellant before hearing the Sinaloa reference. She knew him to be a violent, armed drug dealer who had already physically hurt her. Appellant's threats explicitly indicate that someone other than appellant will harm Kenia or her family. Put differently, appellant is conveying that if he ends up in police custody, Kenia will still not be safe, because someone will harm her or her family on his behalf. The identity of those others is highly relevant.

In sum, the reference to Sinaloa was highly probative on the section 140 charge, did not have undue prejudicial potential and was not cumulative. The trial court did not abuse its discretion by admitting the evidence. Since there was no error in the admission of the evidence, there was no violation of appellant's federal constitutional due process rights.

C.   *The Trial Court Erred in Failing to Instruct the Jury on the Lesser Included Offenses of Domestic Violence.*

Appellant contends the trial court erred in failing to instruct the jury sua sponte on the lesser included offenses of

20

domestic violence under section 273.5, specifically assault (§ 240) and battery (§ 242), and the error was prejudicial. We agree the trial court erred. We do not find the error harmless, and so we reverse the conviction on this count.

As charged in this case, a violation of section 273.5, subdivision (a), occurs when the defendant willfully inflicts a traumatic condition on the victim, and the defendant and the victim had one of the relationships listed in section 273.5, subdivision (b). The relevant relationship here was a "dating" one, which is defined as "frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement independent of financial considerations." (§ 243, subd. (f)(10).) Both simple assault and misdemeanor battery are lesser included offenses of domestic violence in violation of section 273.5. (*People v. Gutierrez* (1985) 171 Cal.App.3d 944, 952.)

" 'When there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of a lesser included offense, the court must instruct upon the lesser included offense, and must allow the jury to return the lesser conviction, even if not requested to do so.' " (*People v. Huggins* (2006) 38 Cal.4th 175, 215.) " ' " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." ' " (*Ibid*.) "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." (*People v. Moye* (2009) 47 Cal.4th 537, 556 (*Moye*).)

We independently review a trial court's failure to instruct on a lesser included offense. (*People v. Cook* (2006) 39 Cal.4th

21

566, 596.) We assess the sufficiency of the evidence without evaluating the credibility of the witnesses. (*People v. Wyatt* (2012) 55 Cal.4th 694, 698.) "[W]e review the evidentiary support for an instruction 'in the light most favorable to the defendant' [citation] and should resolve doubts as to the sufficiency of the evidence to warrant instructions 'in favor of the accused.' " (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1483.)

Appellant contends the jury could have found that Kenia's "intimate" relationship with him was a financial one, based on what he characterizes as her testimony she had sexual relations with appellant in exchange for money and drugs. We agree.

Viewing the evidence in the light most favorable to the omitted instructions, Kenia repeatedly testified that her relationship with appellant was a transactional one, in which she exchanged sex for drugs or money, as set forth below. This is substantial evidence that they were not in a dating relationship. Put differently, this is substantial evidence that an element of the charged offense is missing. As also set forth below, this evidence was contradicted at times by Kenia's own testimony, but it was for the jury to decide what portions of Kenia's testimony to believe.

We review the failure to instruct on a lesser included offense pursuant to *People v. Watson* (1956) 46 Cal.2d 818. Under that standard, we consider what a reasonable " 'jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the

22

defendant complains affected the result.' " (*Moye, supra,* 47 Cal.4th at p. 556.)

The details of the relationship, as provided by Kenia, were that she met him at her aunt's party and wanted to buy cocaine from him, but he just gave it to her. They exchanged phone numbers. She called him and he gave her cocaine. She "[hung] out with him and [became] friends with him." At some point, the relationship turned into a "romantic" relationship. He "hooked [her] up" and kept saying he wanted to be with her, but she told him she was not interested because he was pursuing other women. She thought they were dating. He took her to parks sometimes and they would hang out. They did not go out to restaurants or movies or out dancing.

When asked if she had sex with appellant, she replied that she did, because he "would tell [her] he would give [her] money if [she] had sex with him, and he would always give [her] cocaine to sell or to use." She would text him that she would have sex with him if he gave her money. She later clarified that when they went to the parks, it was late at night to have sex in exchange for money or drugs.

Kenia was asked if her connection with appellant was "a mutually beneficial situation where you got money and drugs and he got sex? Was it that or was this a, I love you, I love you, we're a boyfriend/girlfriend maybe one day we'll get married relationship?" She testified: "Simple money, drugs, and sex."

Kenia did testify that "for a while" she thought appellant wanted to have a relationship with her, because he said he liked her, but then she discovered he was talking to other women. She told him that she did not " 'want to pursue anything, like, further than what we have going on already.' " She was then asked, "[A]t

23

that point, you no longer wanted to give him sex in exchange for money or drugs?" and she replied, "Correct."

Kenia also testified that after her boyfriend passed away, appellant "kind of kept taking advantage of that" saying he wanted to help her out or help her financially because that was what her boyfriend had done. He told her he would take care of her and she could live with him and his grandmother in exchange for cleaning.

We cannot say that the evidence of a transactional relationship is comparatively much weaker than the evidence of a dating relationship. If anything, we would say the reverse. Thus, we cannot say that there is no reasonable probability that the omission of the lesser included instructions did not affect the verdict. Accordingly, we reverse the conviction and remand to permit respondent to retry this charge.

D.      *There Are No Errors to Cumulate.*

Because we have found only one error, we need not and do not consider appellant's claim that the cumulative effect of the trial court's error requires reversal.

E.      *There Is Sufficient Evidence to Support the Trial Court's Findings That the Three Sex Offenses Were Committed on Separate Occasions.*

Appellant was sentenced to indeterminate terms of 25 years to life pursuant to section 667.61, subdivisions (a) and (d)(2) on the three sex offenses. Pursuant to section 667.61, subdivision (i), the trial court imposed the terms consecutively, as required by the trial court's finding that the offenses occurred on "separate occasions" as defined in section 667.6, subdivision (d)(2). Section 667.6, subdivision (d)(2) provides: "In determining

24

whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed sexually assaultive behavior.  Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned the opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

Appellant contends the evidence is insufficient to support the trial court's finding that the sexual offenses took place on separate occasions.  Appellant contends the offenses were part of a continuous course of conduct that occurred in one location without time to reflect between the offenses.

The trial court agreed with the prosecutor that appellant had time to reflect because he "could [not] become erect, and as a result he forced the victim to violate herself by using a foreign object and also perform oral copulation until he was able to become erect."

"[O]nce the trial judge resolves the issue of 'separate occasions,' an appellate court is 'not at liberty to overturn the result unless no reasonable trier of fact could decide that there was a reasonable opportunity for reflection.' " (*People v. Pena* (1992) 7 Cal.App.4th 1294, 1314–1315 (*Pena*); *People v. Garza* (2003) 107 Cal.App.4th 1081, 1092 (*Garza*).)

We cannot find that "no reasonable trier of fact could decide there was a reasonable opportunity for reflection" between the sexual offenses.  Put differently, a reasonable court could decide there was an opportunity to reflect.

Here, Kenia testified appellant first orally copulated her while she was in the back seat of the car. Appellant made her take her pants off, but he was clothed. He was on top of her, holding her legs open. At the same time, he was "grabbing himself, getting himself hard." Kenia believed appellant was finding it difficult to get an erection. When he finished the oral sex, he moved to a normal sitting position and took off his pants and shoes. He retrieved a vibrator from somewhere, gave it to Kenia, and told her to use it on herself. She initially said, "No," but he told her "Do it" and she complied. He touched himself to get an erection. During this time period, they were not physically touching each other. They were effectively sitting side by side. Then, at some point, he stopped touching himself, and put his penis in her vagina; at that point he had an erection.

Appellant contends these acts were a single continuous period of assaultive behavior in a single location with no break or stop and hence no opportunity to reflect before resuming. He contends his case is similar to *Pena*, *People v. Dearborne* (2019) 34 Cal.App.5th 250 (*Dearborne*) and *People v. Corona* (1988) 206 Cal.App.3d 13 (*Corona*), where the courts found no opportunity to reflect.

In both *Corona* and *Dearborne*, the description of the sexual offenses is terse. In *Corona*, the defendant "removed [the victim's] pants and after more kissing put his finger into her vagina. He then kissed her genitals. He then put his penis in her vagina." (*Corona, supra,* 206 Cal.App.3d at p. 15.) In *Dearborne*, the opinion states only that that the defendant forcibly orally copulated the victim, then raped her. (*Dearborne, supra,* 34 Cal.App.5th at pp. 265–266.) The reason for the brevity is presumably the same in both cases. In *Corona*, the Attorney

26

General "tacitly concede[d]" there was no evidence of an interval between the acts allowing time for reflection. (*Corona,* at p. 18.) In *Dearborne*, the People explicitly conceded that the evidence did not show a significant break. (*Dearborne,* at pp. 265–266.) In *Pena*, the evidence affirmatively showed there was no time to reflect. As the court explained, the defendant raped the victim, then "simply flipped the victim over and orally copulated her." (*Pena, supra*, 7 Cal.App.4th at p. 1316.)[7]

The evidence in this case is much more detailed, and we find it similar to the evidence before the court in *Garza*. In that case, "[a]fter the defendant forced the victim to orally copulate him, he let go of her neck, ordered her to strip, punched her in the eye, put his gun to her head and threatened to shoot her, and stripped along with her" before inserting his finger into her vagina. (*Garza*, *supra*, 107 Cal.App.4th at p. 1092) The *Garza* Court found "[t]hat sequence of events afforded him ample opportunity to reflect on his actions" between the two acts. (*Ibid*.) After the defendant inserted his finger in the victim's vagina, he "(1) began to play with the victim's chest; (2) put his gun on the back seat; (3) pulled the victim's legs around his shoulders and, finally, (4) forced his penis inside her vagina." (*Id*. at pp. 1092–1093.) The *Garza* Court found that this sequence of events also afforded the defendant had "adequate opportunity for reflection" between the two sex acts. (*Id*. at p. 1093.)

---

[7] To the extent these cases suggest there must be a clear break between the sexual offenses, we do not agree. There need not be an "obvious break in a perpetrator's behavior." (*People v. Irvin* (1996) 43 Cal.App.4th 1063, 1070.)

Here, appellant similarly engaged in other activities between his sex acts. Between the first and second acts, appellant let go of Kenia's legs, changed his own position, took off his pants and shoes, and retrieved the vibrator. He then had a verbal exchange with Kenia before she began using the vibrator. This is clearly a break in the sex acts and this series of events gave appellant ample time to reflect before the second act began. Once Kenia started using the vibrator, appellant sat by himself and touched himself to get an erection, then when he had one, he stopped self-touching and necessarily changed positions before getting on top of and raping Kenia. This series of events, particularly the break which occurred when appellant realized he had an erection and stopped touching himself, gave him time to reflect before he raped Kenia.

F.     *Section 667.61's Mandatory Consecutive Sentencing Provision Does Not Violate Appellant's Constitutional Rights.*

In his opening brief, appellant contended that the consecutive sentencing requirement of section 667.61, subdivision (i), effectively raised the mandatory minimum sentence for his crimes, and so the underlying factual question of whether the crimes occurred on separate occasions should have been submitted to the jury. He claimed the failure to do so violated his federal constitutional rights to due process and a jury trial.

As the parties acknowledge in supplemental briefing, the California Supreme Court recently considered a similar claim in *People v. Catarino* (2022) 14 Cal.5th 748 (*Catarino*). In that case, the defendant raised the constitutionality of section 667.6, subdivision (d), which requires full consecutive terms upon a finding the offenses took place on separate occasions. The People

28

contend the reasoning of the case shows appellant's argument has no merit. In his supplemental brief, appellant contends that the case is distinguishable because he was sentenced to consecutive sentences under section 667.61.

Appellant's claim is premised on *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*), and *Alleyne v. United States* (2013) 570 U.S. 99. *Apprendi* and *Blakely* hold that due process requires any fact, other than a prior conviction, that increases the maximum possible sentence must be found true by a jury. (*Apprendi,* at p. 490; *Blakely,* at p. 303.) In *Alleyne*, the Court held that this rule also applied to any fact that raises the mandatory minimum. (*Alleyne,* at pp. 111–117.)

As appellant acknowledges, the United States Supreme Court subsequently held in *Oregon v. Ice* (2009) 555 U.S. 160 (*Ice*) that *Apprendi* and *Blakely* do not require a jury determination of any fact which permits the imposition of consecutive sentences. (*Ice,* at pp. 163–165.) The Court in *Ice* explained that it was " '[f]irmly rooted in common law . . . that the selection of either concurrent or consecutive sentences rests within the discretion of sentencing judges.' " (*Id.* at pp. 168–169.)

Appellant contends that the decision in *Ice* rests on the permissive and protective nature of the sentencing scheme involved. The sentencing provision at issue in *Ice* required additional fact finding by the sentencing court in order for the court to have the option of consecutive sentencing. Thus, as the *Ice* Court noted, "the defendant—who historically may have faced consecutive sentences by default—has been granted by some modern legislatures statutory protections meant to temper the

harshness of the historical practice." (*Ice, supra,* 555 U.S. at p. 169.)

Appellant takes too narrow a view of the reasoning of *Ice*. The Court certainly recognized and endorsed the notion that the sentencing provision at issue benefited defendants, but this had no bearing on its substantive decision. As the Court explained, *Apprendi* and other opinions of the Court "make clear that the Sixth Amendment does not countenance legislative encroachment on the jury's traditional domain. [Citation.] We accordingly considered whether the finding of a particular fact was understood as within 'the domain of the jury . . . by those who framed the Bill of Rights.' [Citation.]" (*Ice, supra,* 555 U.S. at p. 168.) Historical practice counsels "against extending *Apprendi*'s rule to the imposition of sentences for discrete crimes. The decision to impose sentences consecutively is not within the jury function that 'extends down centuries into the common law.' [Citation.] Instead, specification of the regime for administering multiple sentences has long been considered the prerogative of state legislatures." (*Ibid.*) "The historical record demonstrates that the jury played no role in the decision to impose sentences consecutively or concurrently. Rather, the choice rested exclusively with the judge." (*Ibid.*) "The historical record further indicates that a judge's imposition of consecutive, rather than concurrent, sentences was the prevailing practice." (*Id.* at p. 169.) Thus, the *Ice* Court concluded: "In light of this history, legislative reforms regarding the imposition of multiple sentences do not implicate the core concerns that prompted our decision in *Apprendi*. There is no encroachment here by the judge upon facts historically found by the jury, nor any threat to the jury's domain as a bulwark at trial between the State and the accused." (*Ibid.*)

States could, if they chose, impose a more detrimental requirement than existed at the common law. As the Court noted, "All agree that a scheme making consecutive sentences the rule, and concurrent sentences the exception, encounters no Sixth Amendment shoal." (*Id*. at p. 162.)

The California Supreme Court has previously made it clear that this historical analysis is the determinative analysis under *Ice*. (See, e.g. *People v. Mosley* (2015) 60 Cal.4th 1044, 1049–1050 [The "*Ice* [C]ourt determined [that] *Apprendi* has no application to sentencing decisions in which juries played no factfinding role at common law."].) This is the analysis our Supreme Court applied in *Catarino* as well. The Court quoted the historical analysis in *Ice* which we have set forth above. (*Catarino, supra,* 14 Cal.5th at p. 755.)

Appellant argues the California Supreme Court was only approving of a scheme which made a defendant better off than he would have been at common law. We do not believe this was a factor at all in the Court's analysis. As the *Catarino* Court explained, "A state could, consistent with the Sixth Amendment, require full-term consecutive sentencing in all cases." (*Catarino, supra*, 14 Cal.5th at p. 757.) This would indisputably make defendants worse off than they were at common law.

We do agree with appellant that the Court in *Catarino* found section 667.6, subdivision (d) benefitted defendants as common law did not, but this does not assist appellant. As the California Supreme Court emphasized, the Court in *Ice* found that "judges traditionally had '*unfettered discretion*' to decide 'whether sentences for discrete offenses shall be served consecutively or concurrently.'" (*Catarino*, *supra*, 14 Cal.5th at p. 755, italics added.) Viewed in this light, any requirement that

31

limits judges' discretion by requiring fact finding before imposing consecutive sentences is beneficial to defendants.  It may not appear so to the defendant whose facts require the consecutive sentences, but it does to the defendant whose facts do not support consecutive sentences.  Thus, "[b]y conditioning the imposition of such consecutive sentences on 'certain predicate factfindings' (*Ice*, [*supra,* 555 U.S.] at p. 164), section 667.6[, subdivision] (d) may be understood 'to temper the harshness' of a historically authorized practice.  (*Ice*, at p. 169)" (*Catarino,* at p. 757.)

Appellant contends that the Court in *Catarino* did not consider the mandatory nature of the consecutive sentencing provision before it (§ 667.6, subd. (d)), while he is challenging the mandatory nature of the consecutive sentencing provision applicable to his sentence (§ 667.61, subd. (i)).  He claims that *Catarino* therefore is not binding authority in this case.  We read *Catarino* differently.

The Court explicitly stated in *Catarino*: "The question here is whether section 667.6[, subdivision] (d), in *requiring* that a sentencing court impose 'full, separate, and consecutive term[s]' for certain sex crimes if it finds certain facts, complies with the Sixth Amendment.  We hold that it does." (*Catarino, supra*, 14 Cal.5th at p. 750, italics added.)  The Court later explicitly remarked upon the mandatory nature of section 667.6, subdivision (d): "As noted, if *Catarino* had been sentenced under the determinate sentencing law or under section 667.6[, subdivision] (c), the trial court could have imposed concurrent sentences or partial consecutive sentences on Catarino's seven counts of conviction, i.e., a full term on one principal count and partial terms on six subordinate counts. Section 667.6[, subdivision] (d), by contrast, *requires* full-term

32

consecutive sentencing upon a finding that 'the crimes involve separate victims or involve the same victim on separate occasions.' Like the statutes in *Ice*, section 667.6[, subdivision] (d) is a 'specification of the regime for administering multiple sentences,' which 'has long been considered the prerogative of state legislatures.' " (*Catarino,* at p. 755, italics added.)

G.  *The Eight-Year Determinate Terms for the Sex Offenses Must Be Stricken.*

Appellant contends and the People agree that the determinate terms for the three sexual offenses (counts 2, 3, and 4) are unauthorized and should be stricken. We agree as well.

On each of these counts, the trial court imposed the indeterminate term of 25 years to life pursuant to section 667.61, subdivision (a), often referred to as the One Strike law.[8] The trial court also imposed a consecutive determinate term of eight years for each count; this is the high term for each offense. (§§ 287, subd. (c)(2)(A) & 289, subd. (a)(1)(A).)

"Because the One Strike law constitutes a separate sentencing scheme for offenses within its scope, punishment for such offenses is not subject to other sentencing schemes, except where the One Strike law so provides." (*People v. Rodriguez* (2012) 207 Cal.App.4th 204, 214.) Thus, a defendant may not be sentenced to both an indeterminate term under section 667.61 and a determinate term for the same count. (*Rodriguez,* at p. 214

---

[8]  This term was based on the jury's true finding on the allegation that appellant kidnapped Kenia within the meaning of section 667.61, subdivision (d)(2).

[court erred in imposing section 667.61 term as an enhancement to the determinate term].)

## DISPOSITION

We reverse the count 1 conviction for domestic violence in violation of section 273.5, and remand to permit the People to retry appellant on this count if they choose.  We strike the eight-year determinate terms for counts 2, 3, and 4.  We affirm the judgment in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

GRIMES, J.

WILEY, J.

34